**Harold Raymond HOOKS, et al., Plaintiffs,**

**Michael E. Provence, et al., Plaintiffs-Intervenors,**

v.

**Louie L. WAINWRIGHT, Secretary, Department of Corrections, Defendant.**

Nos. 71-144-Civ-J-S, 71-1011-Civ-J-S.

United States District Court, M. D. Florida, Jacksonville Division.

April 14, 1982.

Sydney H. McKenzie, III, Dept. of Legal Affairs, Tallahassee, Fla., for defendant.

Richard A. Belz, Thomas A. Daniel, Florida Institutional Legal Services, Inc., Gainesville, Fla., for plaintiffs-intervenors.

Charles H. Livingston, Sarasota, Fla., for plaintiffs.

David J. W. Vanderhoof, Dept. of Justice, Washington, D. C., for amicus curiae U. S. Dept. of Justice.

Thomas McAiley, Miami, Fla., for amicus curiae The Florida Bar.

Bruce S. Rogow, Miami, Fla., for amicus curiae Florida Volunteer Parole Aide Program.

Professor Leslie Harold Levinson, Nashville, Tenn., amicus curiae.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

This is a civil rights class action [1] brought under 42 U.S.C. § 1983 [2] on behalf of all indigent inmates who are presently or will hereafter be in the custody of defendant Louie L. Wainwright, Secretary, Florida Department of Corrections.[3] At issue is the right of Florida's inmates to meaningful access to the courts. This litigation has enjoyed an active, varied and progressively significant history. Eleven years of litigation has operated as a filtering process, culminating in the instant decision. What began as an innocuous action seeking to compel the Clerk of the Florida Supreme Court to send plaintiff Hooks a copy of a Florida Supreme Court opinion has evolved into an action focusing upon a question of considerable import—is the assistance of attorneys, in some form, an essential ingredient of Florida's attempt to comply with the mandate of *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), that prisoners be afforded meaningful access to the courts?

### HISTORY

On November 12, 1970, the Clerk of this Court received a handwritten civil rights complaint seeking to compel Sid J. White, Clerk of the Florida Supreme Court, to send a copy of a Florida Supreme Court opinion to the plaintiff. The plaintiff was Harold

---

1. This litigation actually involves two separate cases raising the same issue that were consolidated by order of May 8, 1972. The only major distinction between the two cases is that Case No. 71–144–Civ–J was filed by Harold Raymond Hooks individually, whereas Case No. 71–1011–Civ–J was filed by Hooks and others as a purported class action.

2. Title 42 U.S.C. § 1983 provides in pertinent part as follows:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. The class was certified by order entered December 6, 1972.

Raymond Hooks, an indigent inmate of Avon Park Correctional Institution, Avon Park, Florida. Hooks had been convicted in state court of distribution and possession of a controlled substance and claimed he needed a copy of the opinion to assist him in pursuing the appeal of his conviction. Mr. White informed Hooks that he would be unable to send a copy of the opinion unless and until Hooks remitted a five dollar fee. Hooks claimed the fee requirement operated to deny indigent prisoners their right of access to the courts.

On November 30, 1970, Hooks submitted a second complaint seeking to compel defendant Louie Wainwright to provide him with access to a law library and a typewriter, thereby considerably broadening the scope of his "access to the courts" claim.[4] Hooks had filed a habeas corpus petition which was summarily denied by the Florida Fourth District Court of Appeal. He desired to appeal the decision, but was totally bewildered as to how to proceed. He expressed his befuddlement in a letter to the late Honorable William A. McRae, Jr., postmarked September 28, 1970: [5]

> What am I supposed to do now. The order [denying his habeas corpus petition] does not give me the slightest indication why the petition was denied. There is no record for appeal, so therefore only grounds for appeal would be mere conjecture on my part. I don't even know if I can appeal the order. If I can appeal it, how do I do it? How much time do I have? To what Court? Who is the Defendant in an appeal? Is it Louie Wainwright through direct appeal? Or is it

the Court of Appeal through Mandamus? Or have I now exhausted my state remedies? I have absolutely no idea what to do.

The solution to his dilemma was, in Hooks' view, access to a law library and a typewriter. On March 2, 1971, the Court entered an order to show cause directing defendant Wainwright to respond to the issues raised in plaintiff's complaint, that is, the availability of law books to Florida's prison population and the availability of alternative means through which prisoners could obtain assistance in preparing pleadings in post-conviction proceedings. The defendant responded by filing a list of the various legal materials available at that time in each institution under his control. The list reflected that, even if all of the materials were combined as one library rather than scattered throughout the state, the library would, for the most part, amount to no more than a useless hodgepodge of outdated statutes, incomplete case reporters and nonessential treatises covering topics such as agency, taxes and trusts.

The list was supplemented by defendant's argument that legal materials are not necessary to the preparation of prisoner pro se pleadings. Referring to the most famous "writ-writer" in jurisprudential history, Clarence Earl Gideon, the state of Florida argued that an inmate need only allege the facts upon which he relied to support his claim, not the law. Hooks decried this contention in his "rebuttal" to the state's response to the order to show cause:

> It is purported that all that is necessary in an application for writ of habeas cor-

4. In an order to show cause entered March 2, 1971, then United States Magistrate Joseph W. Hatchett (now a circuit judge for the United States Court of Appeals for the Eleventh Circuit) ordered that the action against Sid J. White, Clerk of the Florida Supreme Court, be combined with the action against Louie L. Wainwright and that the two cases be assigned one number. The former claim was subsumed within the broader claim against Wainwright. The order to show cause directed defendant Wainwright to respond to the claim that the state of Florida failed to provide prisoners with access to law libraries and did not provide any alternative means through which prisoners could obtain assistance in the preparation of

pleadings in post-conviction legal proceedings. Shortly thereafter, White's name was simply dropped from the style of Case No. 71–144–Civ–J, though he was never formally dismissed as a party defendant. Consequently, inasmuch as these proceedings have continued for 11 years with no mention of, or participation on behalf of, defendant White beyond the initial pleadings, the Court will dismiss White as a defendant.

5. The letter is a part of the court file. The case was initially assigned to Judge McRae, but was transferred and reassigned to the undersigned judge by order dated May 18, 1971.

pus is that facts be stated which if true would be grounds for release. Thus all an inmate need do is state facts. Theoretically he need not have any legal knowledge .... This is based on the theorem that every person knows what facts constitute illegal detention. This obviously isn't so.

"Rebuttal" brief for Plaintiff at 5.[6]

The pleadings prepared by Hooks, while far from being stylistically or grammatically perfect, revealed that he was a highly intelligent and insightful pro se litigant. Nevertheless, his lack of legal training combined with his inability to obtain access to any suitable legal materials forced him to state his civil rights claim in the following fashion: "I guess there is a Federal law prohibiting the Defendant from violating my civil rights." Complaint, filed November 30, 1970. Hooks was equally naive with regard to his rights to conduct discovery, setting forth in his complaint that: "[a] prisoner told me that under a civil action I can make the Defendant answer questions. I guess this is a civil action."

Thus, despite his obvious intelligence, Hooks was manifestly unequipped to pursue a legal action in federal court. This observation served to demonstrate a certain compelling logic inhering in his claims. Nevertheless, because the law at that time failed to provide support for Hooks' position, his complaint was dismissed by order of July 23, 1971.

Shortly after Hooks filed an appeal from the order of dismissal, the Supreme Court decided *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). *Younger* was a per curiam affirmance of a decision entered by a three-judge district court panel holding that the state of California had an affirmative constitutional duty to furnish inmates with some means through which they could be assured of meaningful access to the courts. *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.1970).

In light of the Supreme Court's decision in *Younger,* the United States Court of Appeals for the Fifth Circuit vacated this Court's order of dismissal and remanded the cause for further proceedings. Following an evidentiary hearing on October 4, 1972, this Court entered an order finding that the Florida Department of Corrections did not provide indigent inmates with the assistance of counsel and that the legal materials made available to such inmates were inadequate to enable them to meaningfully pursue avenues of post-conviction relief, relying upon *Younger v. Gilmore, supra.*

> Simply put, in order to insure that inmates are not for this reason denied access to the courts, it is constitutionally mandated that the prison authority furnish indigent inmates with some form of legal assistance which to that extent assures meaningful access to the courts.

Order of December 6, 1972 at 6. Accordingly, the Court directed the parties, including the United States as *amicus curiae,* to submit proposed plans of implementation dealing with the following issues:

> 1. The extent of professional or quasi-professional services which would be provided indigent inmates.
>
>   *     *     *     *     *     *
>
> 2. The extent of the law libraries which would be provided indigent inmates.
>
>   *     *     *  . *     *     *

**6.** In *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D. Cal.1970), *aff'd, sub. nom. Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), a three-judge district court panel adopted a similar position when faced with the argument propounded by the state of California that no understanding of the law is required to prepare meaningful pro se pleadings:

> [T]his Court takes notice that more than simple 'facts' are needed in order to file an adequate petition for relief by way of habeas corpus. A prisoner should know the rules concerning venue, jurisdiction, exhaustion of remedies, and proper parties respondent. He should know *which* facts are legally sufficient, and merit presentation to the court, and which are irrelevant or confusing. When the Return is filed, it is never without abundant citations to legal authority, and a proper traverse must take cognizance of these points. No attorney filing a habeas petition omits a statement of points and authorities, and neither does the State's attorney in responding to one.

319 F.Supp. at 110.

3. The time frame within which implementation can be perfected.

Order of December 6, 1972 at 8–9. Thus, although the complaint at that time focused primarily upon the law library question, the Court gave its first indication that law libraries alone might be insufficient to guarantee meaningful access to the courts on behalf of all indigent prisoners.

Following entry of the order of December 6, 1972, the Court appointed three additional parties to serve as amicus curiae: The Florida Bar; the Florida Volunteer Parole Aide Program; and Professor L. Harold Levinson, who at that time was a professor of law at the University of Florida and who currently teaches at Vanderbilt University. Given the possible far-reaching consequences of the ultimate decision entered in this cause, the Court wanted to ensure that all of the issues presented would be fully researched and developed prior to entering that decision.

On March 7, 1973, defendant Wainwright filed his response to the Court's order regarding implementation of the precepts set forth therein. Defendant's plan called for the establishment of a law library system as the sole means through which to provide meaningful access to the courts for indigent inmates.[7] To the contrary, plaintiffs and each of the four amicus parties took the position that law libraries alone, without professional legal assistance, could never operate to ensure meaningful access to the courts. As set forth by counsel for The Florida Bar: "In short, granting prisoners the use of a law library without the interpretive expertise of a lawyer may be analogized to giving prisoners surgical equipment without a physician." Position of The Florida Bar By and Through Its Legal Aid and Indigent Defendant Committee, filed August 16, 1973 at 4. An evidentiary hearing on the parties' proposed implementation plans was held on August 21, 1973, and the Court took the matter under advisement.

Subsequent to the hearing, there was a lull in the litigation until December 29, 1975, when three inmates in the custody of the Florida Department of Corrections filed a motion for leave to intervene.[8] The three inmates, represented by Florida Institutional Legal Services, Inc. (hereinafter the "Prison Project"),[9] complained that the

---

7. With regard to the Court's command that the parties develop plans dealing with the extent to which professional legal assistance would be provided to indigent inmates in post-conviction matters, defendant Wainwright suggested utilizing the Office of the Public Defender. He acknowledged, however, that enabling legislation would be required to authorize such a plan. Moreover, he argued that a professional legal assistance plan should be provided only as an alternative to, and not in conjunction with, a law library plan. No serious consideration was actually given to employing state public defenders to assist inmates in post-conviction matters until recently. See text *infra*.

8. The three inmates were Michael E. Provence, Howard Douglas (both inmates of Florida State Prison, Starke, Florida) and Ray Broadhead (an inmate of Glades Correctional Institution, Belle Glade, Florida).

9. Florida Institutional Legal Services, Inc. evolved from what was known as the "Prison Project" of Florida Legal Services, Inc., a non-profit corporation organized in 1973 to provide legal assistance to indigent citizens of the state of Florida. Belz, *Legal Services for Florida's Inmates: Expanding Access to the Courts by*

*Hooks and Bounds*, 56 Fla.Bar J. 183 (1982). In 1972, the United States Department of Justice, through the Law Enforcement Assistance Administration (LEAA), began experimenting with legal assistance programs for prisoners in an attempt to reduce recidivism and prison violence. *Id.* It was thought that early intervention by an attorney would operate to relieve tension in prison disputes and, where litigation was necessary, assist the courts by presenting issues in a focused, well-structured manner. *Id.* Florida accepted the offer to participate in a three-year LEAA grant program aimed at establishing an inmate legal assistance program. Rather than create a new entity to provide such services, the state turned to Florida Legal Services, Inc., which agreed to establish the Prison Project as an adjunct. *Id.*

As time passed, the objectives of Florida Legal Services, Inc. shifted away from direct delivery of legal services to indigents. This was due in large part to the increased availability of low or no cost legal assistance from organizations funded by the Legal Services Corp. Eventually, the Prison Project was left as the only branch of Florida Legal Services, Inc. that continued to provide direct client services. *Id.* at 184. These changes ultimately led to the trans-

state had failed to take any action pursuant to the Court's order of December 6, 1972, that is, Florida's indigent inmates were still not being furnished with any means through which they could obtain meaningful access to the courts. Accompanying their motion for leave to intervene was a motion for enforcement of the Court's order. The Court granted the inmates permission to intervene by order of July 7, 1977.

On September 6, 1977, plaintiff-intervenors applied for a preliminary injunction seeking to compel the state of Florida to maintain its funding of the Prison Project after federal funding expired on October 1, 1977 (see note 9, *supra*), and to fill the financial void that would be left when the federal funds ran out. Up until that time the state had been furnishing a percentage of matching funds, but planned to cease all funding upon termination of the federal grant.

The Prison Project provided legal assistance to indigent inmates at Union Correctional Institution, Raiford, Florida, Florida State Prison, Starke, Florida, and Florida Correctional Institution (Women's Unit), Lowell, Florida. Representation extended to collateral attacks on convictions, civil rights actions, marriage dissolutions, child custody and support proceedings, adoptions, Veteran's Administration and Social Security proceedings, immigration and deportation matters, tort claims, contract claims, and will and probate matters. The Prison Project served roughly 25 percent of Florida's inmate population. Plaintiff-intervenors alleged that unless the state continued to fund the Prison Project, it would cease to exist.

In response to plaintiff-intervenors' application for injunctive relief, defendant Wainwright submitted an affidavit setting forth that the Department of Corrections had begun establishing a law library system in Florida's prisons, whereby seven of the state's major institutions would be outfitted with relatively complete law libraries and

the 20 remaining major institutions would receive smaller, lesser-equipped law libraries. Road prisons and community correctional centers would not receive any legal materials; rather, inmates in those facilities desiring to do legal research would have to depend upon a request system whereby they would borrow materials from institutions having law libraries or, alternatively, request to be transferred to one of those institutions.

The plan was intended to conform with defendant's interpretation of the Supreme Court's landmark decision in *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), which had been handed down only a few months earlier. In *Bounds*, which will be discussed in detail *infra*, the Court determined that the fundamental constitutional right of access to the courts required states to affirmatively assist inmates in the preparation and filing of meaningful legal papers by providing adequate law libraries or adequate assistance from persons trained in the law. 430 U.S. at 828, 97 S.Ct. at 1498.

By order of October 6, 1977, entered five days after the federal funds earmarked for the Prison Project had run out, the Court granted plaintiff-intervenors' application for preliminary injunctive relief. After finding that *Bounds* imposed a mandatory duty upon the states to provide assistance sufficient to guarantee inmates the right of meaningful access to the courts in seeking redress of constitutionally-grounded grievances, the Court considered the state's proposed law library plan, expressing serious doubts as to its sufficiency:

> Therefore, although the Supreme Court stated that its experience "indicates the pro se petitioners are capable of using law books to file cases raising claims that are serious and legitimate even if ultimately unsuccessful," this Court's experience, which is supported by the record in this case, is to the contrary.

\*    \*    \*    \*    \*    \*

formation of the Prison Project into an independent corporate entity, Florida Institutional Legal Services, Inc., on November 3, 1978. *Id.*

For convenience, the Court will simply refer to Florida Institutional Legal Services, Inc. as the Prison Project.

This Court holds, therefore, that it is by no means certain that defendant's proposed plan will meet his constitutional duty to ensure access to the courts under the facts of this case and of the specific prison population of the State of Florida.

\* \* \* \* \* \*

This Court holds as well that plaintiff-intervenors and amicus curiae may succeed ultimately in their position that defendant's constitutional duty to ensure access to the Court requires something other than mere prison law libraries.

Order of October 6, 1977 at 6–7. The Court found that since the Prison Project fulfilled at least part of the state's duty to ensure meaningful access to the courts on behalf of Florida's indigent inmates, the defendant was obligated to continue operation of the program until a satisfactory state-wide plan was developed and approved by the Court. Accordingly, the Court preliminarily enjoined the defendant from permitting termination of the Prison Project until final approval of a plan that would satisfy defendant's constitutional duty.[10]

Defendant unsuccessfully appealed from the order granting the preliminary injunction. In a per curiam opinion entered August 24, 1978, the United States Court of Appeals for the Fifth Circuit affirmed the decision of this Court concluding that "[t]he evidence amply supports its finding that, at the time the injunction was issued, the defendant was not providing the minimum level of legal assistance that is constitutionally required." *Hooks v. Wainwright,* 578 F.2d 1102, 1103 (5th Cir. 1978).

A final evidentiary hearing was set for July 26, 1978. A week prior to the hearing the Court entered an order granting plaintiffs' motion to amend the complaint to conform with the evidence presented as of that date, i.e., to include the claim that professional legal assistance, in addition to law libraries, is necessary to fulfill the state's constitutional duty to ensure meaningful access to the courts on behalf of Florida's inmates. The final evidentiary hearing was held July 26 and 27, 1978, following which the parties submitted proposed findings of fact and conclusions of law. The matter was then taken under advisement by the Court.

Since that time the Court has held numerous status conferences in the hope that the parties could reach an amicable settlement acceptable to all concerned, including the Court. The Court has occupied a somewhat precarious position in these post-trial proceedings. On the one hand, the Court has wanted to avoid excessive entanglement in the administration of Florida's penal system, believing that a resolution reached by the parties would be more palatable and credible than one imposed by judicial fiat. On the other hand, inasmuch as this Court is charged with the responsibility of interpreting and giving substance to the rights guaranteed to plaintiffs under the federal Constitution, it has felt duty bound to press for an end to this protracted litigation, by one means or another.

The need for judicial resolution of this matter was almost obviated when the parties reached tentative agreement upon a plan that would have required state public defenders to assist indigent inmates in post-conviction and parole revocation proceedings, as well as in actions challenging their conditions of confinement.[11] The success of the plan, however, depended upon the enactment of enabling legislation introduced in both chambers of the Florida Legislature during the 1981 Regular Session. H.B. 1129 Reg.Sess. (1981); S.B. 888 Reg.Sess. (1981). Unfortunately, the legislation died in com-

---

**10.** The injunction was clarified by order of October 28, 1977. Originally, it provided that defendant "is enjoined ... from ceasing and desisting to continue the operation of the ... Prison Project ...." Defendant, in his motion for clarification, argued that since he had never had a hand in operating the Prison Project to begin with, he could not be ordered to "continue" its operation. Accordingly, the injunction was modified to provide that defendant "is enjoined ... from permitting the termination of the ... Prison Project ...."

**11.** The only inmates who would have been eligible to receive aid under the plan were indigents "unable by reason of lack of the necessary education or linguistic skills or by lack of access to library facilities to represent" themselves. H.B. 1129 Reg.Sess. (1981); S.B. 888 Reg.Sess. (1981).

mittee in both the Florida Senate and the Florida House of Representatives, ending a valiant compromise effort on behalf of the respective parties herein.

Consequently, at the status conference held July 1, 1981, the parties agreed that the point has been reached where all further settlement negotiations would be futile. Accordingly, they requested that the Court enter an appealable order regarding the pivotal question that remains outstanding, that is, is the assistance of attorneys, in some form, an essential ingredient of Florida's attempt to comply with the mandate of *Bounds v. Smith, supra,* that inmates be afforded meaningful access to the courts? The Court expressed concern as to whether additional, updated evidence should be received inasmuch as the three evidentiary hearings were held in 1972, 1973 and 1978, respectively. All parties insisted that for the purpose of deciding the question set forth above, the evidence in the record was sufficient in both volume and content. Transcript of Status Conference held July 1, 1981. It is against this backdrop that the Court will proceed to consider and decide this case.

## CHARACTER OF FLORIDA'S PRISON SYSTEM AND INMATE POPULATION

The Florida Department of Corrections currently operates 80 separate facilities housing 21,575 offenders. Annual Report of the Florida Department of Corrections FY 1980–81 at 58 (hereinafter "1980–81 Annual Report").[12] Of those 80 facilities, 25 are major institutions, 31 are community cor-

rectional centers and women's adjustment centers. The remaining facilities are mostly road prisons and vocational training centers. 1980–81 Annual Report at 10, 24 and 72. The institutions are widely dispersed among Florida's 67 counties, from Pensacola Community Correctional Center in the far corner of Florida's panhandle to Big Pine Key Road Prison down in the Florida Keys.

Only one of the 25 major institutions houses less than 200 inmates. Seventeen of the institutions house more than 500 inmates each and five institutions house more than 1,000. 1980–81 Annual Report at 72. Close to 3,000 inmates are housed in the various road prisons, community correctional centers and vocational training centers. *Id.*

As for the prisoners themselves, the evidence received in this case has consistently shown that more than half of Florida's inmates are functionally illiterate. This was demonstrated to be true at both the 1973 and 1978 evidentiary hearings and remains true today as reflected in the 1980–81 Annual Report. In 1973, as shown by the defendant's own statistics, 55.45 percent of Florida's inmates read below the seventh grade level. 1973 Tr. 91.[13] Those statistics also showed that, as of December 31, 1972, 56.46 percent of the inmates had an Intelligence Quotient (IQ) of less than 100. Amicus Curiae (USA) Ex. 10. Approximately 14 percent of the inmates had an IQ of less than 80, while another 14 percent fell within the 80 to 89 range. *Id.* An IQ of 100 is generally considered average, whereas an IQ of from 68 to 83 is considered borderline

12. The Court will take judicial notice of the material contained in the Annual Report of the Florida Department of Corrections FY 1980–81 inasmuch as the information is not subject to reasonable dispute and is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Prior annual reports of the Department have been admitted into evidence without objection.

13. The transcript of the evidentiary hearing held October 4, 1972 will be referred to as "1972 Tr. ____;" the transcript of the evidentiary hearing held August 21, 1973 will be referred to as "1973 Tr. ____;" and the transcript of the

final evidentiary hearing held July 26 and 27, 1978 will be referred to as "1978 Tr. ____." Plaintiffs' evidentiary exhibits will be referred to as "Plaintiffs' Ex. ____;" plaintiff-intervenors' evidentiary exhibits will be referred to as "Plaintiff-Intervenors' Ex. ____;" and the evidentiary exhibits of the amicus curiae parties will be referred to as "Amicus Curiae (____) Ex. ____," with the particular amicus party designated within the parenthesis. For some reason, all of the defendant's evidentiary exhibits were marked as "Respondent's" exhibits. For purposes of clarity and convenience, these exhibits will be referred to as "Defendant's Ex. ____."

retarded. Office of Mental Retardation Coordination, U.S. Dept. of Health, Education & Welfare, Problems of Mental Retardation (DHEW Pub. No. OS–72–25) 4–5 (1972).

The situation did not improve during the five years between the 1973 evidentiary hearing and the final evidentiary hearing held in 1978. Although statistics regarding the educational levels and mental capacity of Florida's prison population as a whole apparently were not available, evidence received at the 1978 evidentiary hearing did show that the average inmate admitted to the custody of the Florida Department of Corrections during fiscal year 1976–77, while claiming a 10th grade education, tested at only a 6.2 grade level. Plaintiff-Intervenors' Ex. 7 at 53. That same average inmate had an IQ of less than 100. *Id.*

Statistics for the most recent fiscal year, as broken down by the Department of Corrections into demographic groups, list the average tested grade level of all inmates admitted during the year as follows: "Typical White Male Offender": 8.5; "Typical Black Male Offender": 6.4; "Typical White Female Offender": 8.9; "Typical Black Female Offender": 6.6. 1980–81 Annual Report at 74. The average IQ for inmates admitted during the 1980–81 fiscal year was 88.3, while the average IQ among all inmates within the system was 91.0. 1980–81 Annual Report at 78. Twenty-nine percent of the inmates admitted last year had an IQ of less than 80, while 22 percent of the total prison population fell into that category. *Id.*

The parties stipulated at the 1973 hearing that 95 percent of the persons in the custody of the Florida Department of Corrections are unable to afford counsel. 1973 Tr.

179–80. Recent statistics published by the Department bear this out. Almost 50 percent of the inmates admitted during the 1980–81 fiscal year had a gross monthly income of less than $100 at the time of arrest. 1980–81 Annual Report at 86. Almost three-fourths of the inmates earned less than $600 per month while less than 10 percent earned more than $1,000 per month. *Id.*

## DEFENDANT'S PROPOSED PLAN

The defendant's plan, formulated in response to the decision of the Supreme Court in *Bounds v. Smith, supra,* calls for the establishment of seven "major" law libraries and 20 "minor" law libraries operated by inmate law clerks and staff librarians. At the time of the 1978 evidentiary hearing most of the major libraries were already in operation. The defendant had, however, decided against proceeding with the installation of the minor libraries, not wishing to expend the funds in the event this Court ultimately disapproved the plan. 1978 Tr. 55.[14]

The major libraries were placed in seven of the state's largest penal institutions: Apalachee Correctional Institution, population 1,409; Union Correctional Institution, population 2,272; Florida State Prison, population 1,157; Sumter Correctional Institution, population 954; Glades Correctional Institution, population 809; Avon Park Correctional Institution, 1,240; Broward Correctional Institution (women's institution), population 330. Defendant's Ex. K at 1; 1980–81 Annual Report at 72. The collection of legal materials contained in the major libraries are, with notable exceptions, relatively complete.[15] These major libraries, however, serve less than 50 percent of

14. Defendant has apparently reconsidered this position, for the 1980–81 Annual Report indicates that 12 minor law libraries have already been established. 1980–81 Annual Report at 20.

15. The major libraries are supposed to contain the following materials, as set forth in Policy and Procedure Directive 4.10.06 (Defendant's Ex. K):

  1. Florida Statutes Annotated (West), 65 volumes
  2. Florida Digest (West), 37 volumes

  3. United States Code Annotated (§§ 1981–1985, West), 42 volumes
  4. Southern Reporter 2d Series, Florida Cases (West)
  5. Criminal Law Reporter (Bureau of National Affairs)
  6. Black's Law Dictionary (Revised 4th ed.)
  7. Supreme Court Reporter (1950 to date, West), 45 volumes
  8. Federal Reporter 2d Series (1950 to date, West)
  9. Federal Supplement (1950 to date, West)
  10. Shepard's United States Citations

Florida's prison population, that is, they are housed at institutions containing a total of less than 50 percent of the inmates in the custody of the Florida Department of Corrections.

Moreover, many inmates housed at an institution fortunate enough to have one of the defendant's major law libraries would not have direct access to the library. For example, testimony at the 1978 hearing established that as many as 700 of Florida State Prison's 1,100 inmates would be prohibited from gaining physical access to the law library. 1978 Tr. 410–17.[16]

Under the defendant's plan, inmates who are denied physical access to a law library would have to submit written requests to have specific legal materials brought to their cells. In the absence of a demonstrated, yet undefined, "justification", such inmates would be limited to three citations per request and one request per week. Defendant's Ex. Z.

In addition to the seven large law libraries installed at the institutions set forth above, the defendant's plan provides for the establishment of smaller law libraries at 20 other major institutions operated by the Department. These "minor" law libraries would lack several significant sets of materials available at their seven favored coun-

terparts.[17] They would, e.g., not be furnished with West's Federal Reporter 2d Series or Federal Supplement, nor would they receive any type of case reporter containing opinions of the United States Supreme Court. Moreover, while the minor law libraries would be outfitted with volumes of United States Code Annotated (U.S.C.A.) covering a portion of the federal civil rights statutes (§§ 1981–1985), they would not receive any volumes of U.S.C.A. relating to federal habeas corpus remedies or federal crimes and criminal procedure. Affidavit of Louie L. Wainwright, filed September 20, 1977.

As for the more than 40 remaining state correctional facilities, i.e., the various road prisons and community correctional centers, they would not receive any legal materials whatsoever under the defendant's plan. Rather, inmates in those institutions, who number approximately 3,000, would have to send requests for specific legal materials to the nearest institution having a library. Photostatic copies of the requested materials would then be made and sent to the requesting inmate. Defendant's Ex. K. Alternatively, an inmate housed in a facility without a law library could request to be transferred to an institution that does have a law library, either on a temporary or permanent basis. 1978 Tr. 59–60.[18]

---

11. Shepard's Federal Citations
12. Wright & Miller, Federal Practice and Procedure (West)
13. LaFave & Scott, Hornbook on Criminal Law
14. Shepard's Florida Citations
15. Florida Jurisprudence (1st and 2d Series)
16. Adkins & Harrison, Florida Criminal Law and Procedure Annotated
17. Modern Federal Practice Digest (West)
18. West's Federal Practice Digest (West)

Notably absent from the list is Sokol's Federal Habeas Corpus (2d ed. 1969) and Antieau's Federal Civil Rights Acts: Civil Practice (1971), two authoritative works that would be of particular importance to prisoners untrained in the law desiring to pursue federal remedies. In addition to the above-listed materials, some of the larger prison libraries have a mélange of other materials donated by various sources over the years. These materials are generally incomplete and outdated. 1978 Tr. 334–36; Defendant's Ex. T.

**16.** In 1978 approximately 450 Florida State Prison inmates were housed in administrative confinement or on death row. Those inmates, in addition to the 250 to 300 inmates housed in the "O Unit," were not permitted direct access to the law library. 1978 Tr. 410–17.

**17.** The minor or "local" libraries are, according to defendant Wainwright's affidavit filed September 20, 1977, supposed to be equipped with the following materials:

1. Florida Statutes Annotated (West), 65 volumes
2. Florida Digest (West), 37 volumes
3. Florida Practice Series
4. United States Code Annotated (§§ 1981–85)
5. Southern Reporter 2d Series (Florida Cases) (West)
6. Criminal Law Reporter (Bureau of National Affairs)
7. Black's Law Dictionary (Rev. 4th ed.)

**18.** Defendant argues that it is unnecessary to install law libraries in the road prisons or com-

Apparently aware that law libraries alone would be insufficient to ensure meaningful access to the courts on behalf of Florida's inmates, the defendant has attempted to bolster the credibility of his plan through a program whereby the institutional law libraries are to be operated by inmate law clerks and staff librarians trained in the art of legal research. Much of the testimony at the 1978 evidentiary hearing was devoted to demonstrating the effectiveness of the legal assistance rendered by such inmates and librarians to the rest of the prison population. As will be discussed in detail *infra*, the Court remains unpersuaded.

The defendant's program, modeled after one adopted by the New York Department of Corrections Services, originated in May 1978 when Carter Benjamin, a representative of West Publishing Co., administered a 30-hour course in legal research to a group of inmates and staff librarians selected from the seven institutions designated to receive major law libraries. The course was devoted largely to the mechanics of legal research and library management, e.g., how to use a digest, how to Shepardize a case, how to install pocket-parts, etc. 1978 Tr. 97. The course also included brief explanations of the distinction between state and federal law, the distinction between substantive and procedural law, the distinction between primary and secondary legal authority, and similar matters. *Id.* While Mr. Benjamin insisted that some instruction was given on how to draft legal papers, he conceded that it was limited and that the primary purpose of the course was to teach the bare-bones mechanics of legal research.[19]

## INSUFFICIENCY OF DEFENDANT'S PLAN AND COURT'S CONCLUSIONS OF LAW

"It is now established beyond doubt that prisoners have a constitutional right of ac-

cess to the courts," *Bounds v. Smith, supra,* 430 U.S. at 821, 97 S.Ct. at 1494, and that the burden is upon the states to ensure that the right of access remains unfettered. 430 U.S. at 829, 97 S.Ct. at 1498. To be constitutional, the right of access, as distilled from an abstract concept to a working apparatus, must be "meaningful." 430 U.S. at 823, 97 S.Ct. at 1495. Indeed, "*meaningful* access to the courts is the touchstone." *Id.* (emphasis added). Under *Bounds,* the right of meaningful access extends to the preparation and filing of actions challenging the fact of a prisoner's confinement (e.g. habeas corpus), as well as to actions challenging the legality of the conditions of confinement (civil rights). 430 U.S. at 827, 97 S.Ct. at 1497; *see Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (habeas corpus); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (civil rights).

Consequently, the question of whether inmates *should* be afforded meaningful access to the courts is no longer open to discussion. Rightly or wrongly, wisely or unwisely, the highest court of our land has answered that question affirmatively. Therefore, the only question left to decide is what type of plan would be sufficient under the factual record developed in this case to ensure meaningful access to the courts on behalf of Florida's inmates. The defendant contends that his law library plan, as supplemented by inmate law clerks and staff librarians, is sufficient. This Court disagrees.

The Court is cognizant of the fact that other courts have held that law libraries are sufficient in and of themselves to protect the constitutional right of meaningful access to the courts. In fact, it was a law library system that the Supreme Court gave approval to in *Bounds.* That case, however, was decided on summary judg-

munity correctional institutions because many inmates confined in those facilities have some freedom to come and go.

**19.** Mr. Benjamin was quick to erase any notion that West Publishing Co. was assuming the responsibility of training the inmates to function as writ-writers:

Q. Now West does not take any responsibility of training inmates to be writ-writers, do they?
A. No.
Q. It's really legal law library assistants that you're directing your training at; is that correct?
A. That's correct.
1978 Tr. 112.

ment, without the benefit of an evidentiary hearing. To the contrary, the factual record in the instant case has been fully developed over more than 11 years of hard-fought litigation that has included three evidentiary hearings and numerous status hearings. It is embodied in boxes burgeoning with court files, transcripts and evidentiary exhibits.

Ultimately, the decision that will be entered today rests upon this factual record. Mindful that *all* inmates are entitled under the law to meaningful access to the courts, it would be intellectually dishonest for this Court to conclude that such a result could be achieved under the defendant's proposed plan, given the geographical distribution of inmates throughout the state and, more important, the high level of illiteracy among Florida's prisoners. Rather, it is the Court's view that meaningful access to the courts on behalf of Florida's prisoners can be realized only through the assistance of attorneys, in one form or another.

The Court has already described the rudiments of defendant's plan. It is comprised of two components—law libraries and inmate law clerks. Ignoring for the moment the inmate law clerk program, the Court finds two major defects in the defendant's proposed library plan: (1) the plan falls far short of ensuring that all of Florida's state prisoners would have physical access to an adequate law library and; (2) even assuming that all prisoners would have such access, the high level of illiteracy among Florida's prisoners would render it virtually impossible for them to conduct meaningful legal research.

It has been established beyond peradventure that under defendant's plan the majority of Florida's inmates would not have physical access to one of the seven major law libraries. As noted *supra*, the major law libraries have been placed at institu-tions housing only approximately 50 percent of the inmates in the custody of the Florida Department of Corrections. Moreover, hundreds, perhaps even thousands, of inmates at institutions fortunate enough to have a major law library would not be granted direct access to those libraries.

Such inmates, e.g., those housed in administrative confinement or on death row, would, as noted, be forced to rely upon a system whereby they must request specific legal materials from their cells. It should be obvious that such a system is wholly inadequate to ensure meaningful access to the courts. As the United States Court of Appeals for the Fourth Circuit aptly observed in *Williams v. Leeke*, 584 F.2d 1336 (4th Cir. 1978): [20]

> Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer in exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

584 F.2d at 1339; *Accord, United States ex rel. Wolfish v. Levi*, 439 F.Supp. 114, 130. (S.D.N.Y.1977), *aff'd sub nom., Wolfish v. Levi*, 573 F.2d 118 (2d Cir. 1978) (although concluding that many prisoners housed in the institution at issue had no need for access to a law library, the district court disapproved of the "lending library system"

---

20. Appellant Williams was confined in a maximum security facility in South Carolina. Prisoners confined in maximum security were not permitted access to a law library. Rather, they were required to request books from a central library which often entailed a delay of from one to two weeks. 584 F.2d at 1338. After expressing its opinion that prisoners should ordi-narily have direct access to a law library, the court concluded that it was unnecessary to reach the question regarding the reasonableness of the South Carolina library plan in light of the fact that state funded programs provided professional legal assistance to prisoners contesting the legality of the fact or the conditions of their confinement. 584 F.2d at 1339.

whereby inmates had to send written requests from their cells for specific legal materials.)

When one combines the observations of the Fourth Circuit Court of Appeals with the fact that, under the instant plan, digests, citators and other basic search materials would apparently never be permitted to leave the law libraries,[21] the unacceptability of defendant's library plan is accentuated. In other words, an inmate in administrative confinement at, e.g., Florida State Prison, would be limited to requesting specific volumes of case reporters from his cell with no means of ascertaining in advance whether they contained cases relevant to his legal problem.[22] Moreover, the inmate would be restricted to requesting only three volumes or cases per week.

The portion of defendant's plan providing for minor law libraries at 20 institutions is constitutionally deficient not only as to inmates who would be denied direct access to such libraries, e.g., those in administrative confinement, but even as to those inmates who would be granted direct access. As noted *supra*, the minor law libraries would not be furnished with, *inter alia*, Federal Supplement, Federal Reporter 2d Series or significant portions of United States Code Annotated. It is difficult to discern how one could be expected to perform meaningful research into federal habeas corpus or civil rights matters without the assistance of those materials. In fact, the Fifth Circuit Court of Appeals has all but held that Federal Supplement is a necessary component of meaningful legal research. In *Cruz v. Hauck*, 627 F.2d 710 (5th Cir. 1980), the court observed:

> The district court erred when it said, without explication, that the absence of the Federal Supplement from a library for 700 prisoners was almost de minimis. Many important prisoner rights cases are

decided in and go no farther than the district court, and the Federal Supplement from 1960 or so on should probably be available in an adequate large prison law library.

627 F.2d at 720. This observation, it would seem, applies *a fortiori* with regard to the relevant portions of United States Code Annotated and Federal Reporter 2d Series inasmuch as the former spells out what the federal law is and the latter contains, in most instances, the final word interpreting that law. All three of these sources were included in the collection of books found to be in accordance with "a list approved as the *minimum* collection for prison law libraries" by the American Correctional Association, the American Bar Association and the American Association of Law Libraries. *Bounds v. Smith, supra*, 430 U.S. at 819 n. 4, 97 S.Ct. at 1493 n.4 (emphasis added).

As for the approximately 3,000 inmates confined to institutions that, under defendant's plan, would not receive any legal materials whatsoever, they would be deprived of virtually any opportunity to enjoy meaningful access to the courts. The defendant's plan calls upon such inmates to send written requests for specific materials to the regular librarian of their institution, who in turn is supposed to forward the requests to the librarian of an institution that has a law library. The law librarian at the receiving institution is then supposed to make copies of the requested materials and mail them back to the requesting librarian, who is then supposed to give the copies to the requesting inmates. Defendant's Ex. K.[23]

Even assuming the logistics of this cumbersome, slow-moving arrangement could be carried out to perfection, which the Court doubts, the plan would still be patently unacceptable for reasons already set

**21.** 1978 Tr. 547.

**22.** Under the defendant's plan, each institution would be responsible for formulating its own rules regarding use of the law library. John Clark, staff librarian at Union Correctional Institution, testified that he "believed" that if an inmate in administrative confinement desired to do legal research, the inmate could be

brought down to the library in chains. 1978 Tr. 330.

**23.** This arrangement also applies to inmates confined at institutions with minor law libraries who wish to obtain copies of materials available only from the institutions with major law libraries. Defendant's Ex. K.

forth, i.e., it is absurd to expect that anyone, particularly an untrained and typically uneducated prisoner, could conduct meaningful legal research under such a "shot in the dark" approach. In practice, an inmate confined to an institution with no law library would be required to know the citation of the precise case or statute upon which he intended to rely. In all but the rarest of situations, that would be impossible.

Witnesses for defendant testified at the 1978 hearing that a prisoner confined to an institution without a law library could request to be transferred to an institution with a law library if he desired to conduct legal research, but this policy is not expressed in the defendant's Policy and Procedure Directive (Defendant's Ex. K) that sets forth the rules on accessibility to legal materials. Assuming, however, that such is the case, it is an unsatisfactory policy to require that an inmate at, e.g., a community correctional center, who is permitted a relatively great degree of freedom, transfer to one of the high security facilities in order to enjoy his/her right of access to the courts.

In the final analysis, the problems of guaranteeing physical access to a suitable law library on behalf of all state prisoners would appear almost insurmountable under the defendant's plan or any moderate variation thereof. This is due in large part to the numerosity and wide geographic dispersal of the correctional facilities and inmates under defendant's control. Defendant's law library plan was apparently fashioned after the system employed by the state of New York, yet the semblance between the two plans is minimal. Whereas the defendant's plan calls for the establishment of only seven complete law libraries to serve 21,575 prisoners confined in 25 major institutions and more than 50 other smaller institutions, the state of New York operates complete law libraries in each of its 22 major institutions and supplements the law library program by funding Prisoner Legal Services, an organization employing 22 attorneys and seven paralegals, to provide professional legal assistance to prisoners. 1978 Tr. 219, 226, 227.

Assuming, however, for the sake of argument that all of the prisoners within the defendant's custody would be provided with unlimited access to one of the defendant's major law libraries, the law library plan would still fail to pass constitutional muster due to the high level of illiteracy among the inmates. As set forth *supra*, roughly half of Florida's inmates read at or below the seventh grade level. The typical inmate has a below average IQ, while twenty-two percent (more than 4,500 inmates) of the prisoners have an IQ of less than 80, i.e., at or below the level that would be considered borderline retarded. Given the extreme complexity of most legal writing and the sophistication of most legal reasoning, the Court has no doubt whatsoever that the vast majority of Florida's prisoners are totally unequipped to pursue meaningful legal research. This observation is borne out by the Court's substantial amount of experience with pro se prisoner litigants over the years.

Dr. George E. Mason, Professor of Reading at the University of Georgia, testified on behalf of amicus curiae (USA) at the 1973 evidentiary hearing. Dr. Mason had been requested to conduct a study of various legal materials included in the "Expanded Collection for Prison Law Libraries Recommended by the American Association of Law Libraries," which was identical to the list of materials originally proposed to be included in Florida's prison law libraries as set forth by defendant Wainwright in his response to the Court's order of December 6, 1972. 1973 Tr. 64–65.

Dr. Mason utilized two professionally accepted formulas to arrive at a "readability estimate" for each of 130 excerpted passages. The readability estimates were derived by measuring sentence complexity and word complexity and mathematically balancing the two to determine the reading difficulty of the materials. Dr. Mason concluded that the materials he tested consistently rated at the college or college graduate level in reading difficulty. 1973 Tr. 71. Of course, any law student, lawyer or judge could have offered the same conclusion without the benefit of a mathematical study.

Dr. Thomas L. Porter, Chairman of the Department of Counseling and Student Professional Services at the University of Georgia, utilized Dr. Mason's study and the defendant's statistics regarding the educational level and IQ distribution among Florida's prisoners to reach a conclusion regarding the likely degree of success Florida's inmates would experience in attempting to use a law library. Dr. Porter testified that for more than 50 percent of the inmates, i.e., those reading at or below the sixth grade level, attempting to read a law book would be akin to attempting to read a book written in a foreign language.[24] 1972 Tr. 93. While he concluded that there would be rare instances in which an exceptional inmate who read at the sixth grade level could effectively use legal materials, he emphasized that there would also be individuals who read at a higher level who would nevertheless be unable to use such materials. 1973 Tr. 91–92.

**24.** No evidence has been presented concerning the number of Spanish-speaking inmates in the custody of the Florida Department of Corrections, but the Court can take judicial notice that the number must be fairly sizable given the large Spanish-speaking population in South Florida. Obviously, for such inmates, Dr. Mason's conclusion would transcend the realm of analogy to the realm of literal truth.

**25.** The Court is in agreement with the following assessment offered by Richard Belz, Director of the Prison Project, at the 1978 evidentiary hearing:

> They [the inmates] can read the books, you can teach them how to Shepardize, you can teach them how to use the Digest. But I think it's strange credulity to say that you can then expect this average inmate, who tests at a 6th grade educational level, to make good legal arguments, to analyze case law, to find relevant law and to write a brief that made legal sense.
> We see an awful lot of pro se motions that sound very nice, but they are just strings of legal words copied from Reporters. But when you put them together, they don't make any sense.

1978 Tr. 544.

**26.** The following is a good example of a pro se civil rights complaint that, while arguably setting forth a claim of retaliatory action by prison officials stemming from plaintiff's exercise of his right of access to the courts, fails to allege any facts that would tend to support such a claim:

The evidence presented in this cause with respect to the educational attainments and mental capacities of Florida's inmates has simply served to confirm what the Court has always suspected; that, although there are some exceptions, it is ludicrous to believe that Florida's prisoners are able to conduct meaningful legal research and effectively seek redress of their grievances without the aid of professional legal assistance. The experience of this Court has consistently been that inmates, due to their lack of education and frequently below-average mental capacity, are prone to file legal actions that are either frivolous or unintelligble, or both.

On some occasions, despite a valiant effort, the Court is unable to divine even a faint glimmer of meaning from the prisoner's petition.[25] More often, the petition is sufficient to convey the general gist of the inmate's complaint, but it is insufficient to state a claim.[26] This does not necessarily

> Mr. Martin: being vocational counselor, are the *essence* of *conspiracy*. As to why Marshall, are locked up anyway. Because he took inmate: Joseph Nelson, # 854467, The inmate. He is locked up for and brought from city D.O.T. to county D.O.T. After failing to get along with his fellow inmates, on city D.O.T. *Prior* to January 7th, 19*82*, plaintiff, Marshall, had worked on county D.O.T. without any problems at all. Mr. Martin placed Nelson, on county D.O.T. to *harass* and to *intimidate* Marshall, because he had a civil suite against Mr. Martin's *boss man*, Mr. Wainwright. Please see: Marshall vs. Wainwright, No. –81–1203–Civ–J–M. Also see Lawtey Correctional Institutional Department of Corrections Disciplinary Report. Jan. *15*, 1982. Plaintiff Marshall, was not allowed to call witness in his behalf. These state personnel have all shown discrimination toward Marshall, in some kind of *shape, fashion*, and *form*. Since he have been a prisoner at this institution Plaintiff, hope and pray that this honorable, court will grant his complaint. And he shall ever pray.

*Marshall v. Martin*, Case No. 82–126–Civ–JHM. The Court does not focus upon this particular complaint to embarrass or ridicule Mr. Marshall. He undoubtedly set forth his claim to the best of his ability. Marshall's complaint is no worse in its form and content than many other pro se prisoner petitions. To the contrary, his is a paradigmatic petition, exemplifying the inherent absurdity of the position that prisoners are able to prepare meaningful legal papers.

mean that there is no meritorious claim underlying the prisoner's allegations, but only that the prisoner is unable to express it in a form sufficient to withstand judicial scrutiny. Usually, the harder a prisoner attempts to function as his own lawyer, the more ineffective he becomes. Prisoners with access to legal materials apparently feel constrained to clutter up their petitions with string-cites of inapposite cases, accompanied by lots of legal-sounding phrases.[27] Such attempts generally operate to obscure the facts, thereby lessening the prisoner's likelihood of success.

Even if the Court is able to understand the prisoner's petition, the chances are good that the action will never ripen into a hearing on the merits. Many civil rights actions are dismissed outright, without even the need for a responsive pleading to be filed. Title 28 U.S.C. § 1915(d) authorizes a court to screen in forma pauperis petitions to determine if they are frivolous prior to ordering service of process. An increasing number of civil rights actions have been meeting an early demise through this mechanism.

In recent times, this Court has had to deal with many nugatory claims of civil rights deprivations which, although rather pitiful, can also be somewhat humorous. One inmate claimed his civil rights were being violated because he was forced to turn on the light in his cell prior to receiving his breakfast. Another sought damages on the ground that he had suffered vision impairment as a result of having to look through bars and dirty glass every day. Yet another prisoner claimed his civil rights were violated during an alleged attack by a cockroach that bit his ear. Often the civil rights claims extend beyond the realm of frivolity into the world of the bizarre, e.g., one inmate claimed defendant Wainwright was violating his civil rights by reading his mind without a warrant. The Court feels safe in assuming that an attorney would advise against filing any of these actions.[28]

Nevertheless, while many of the pro se civil rights complaints are properly dismissed as frivolous, many others are dismissed as a result of the inmate's failure to respond to court orders directing the prisoner to amend a defective complaint or because the inmate failed to respond to a motion to dismiss or motion for summary judgment. The Court feels some sympathy for the untrained, uneducated inmate who is faced with the task of responding to such orders and motions. It is likely that many inmates simply throw up their hands and abandon their claims rather than attempt to make sense of the legalese contained therein.

As for federal habeas corpus petitions, these are most often disposed of on the ground that the petitioner has failed to exhaust his state remedies pursuant to 28 U.S.C. § 2254(b). In Florida, a habeas petitioner must first raise each claim in a Fla.R. Crim.P. 3.850 motion prior to filing in federal court. He is also required to appeal from the denial of the Rule 3.850 motion within the state court system. *Leonard v. Wainwright*, 601 F.2d 807 (5th Cir. 1979). Moreover, the Supreme Court recently ruled that district courts are required to dismiss "mixed" petitions, i.e., those containing both exhausted and unexhausted claims. *Rose v. Lundy*, —— U.S. ——, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). While the intricacies of a concept such as "exhaustion of state remedies" may be relatively simple for most attorneys to understand, it is unlikely that the same holds true for a prisoner who reads at the seventh grade level or who has an IQ that borders on the level of retardation.

**27.** For example, one inmate captioned his initial pleading "The Wave-Like Form of Fronds." Despite earnest effort to derive some legal meaning from the petition, the document succeeded only in evoking an image of a balmy afternoon at the beach, waves caressing the shore and palm fronds rustling in the ocean breeze.

**28.** In fact, the claim referred to in text, *supra*, regarding the inmate who was required to turn on the light in his cell prior to receiving his breakfast, came to the Court's attention by way of a petition in which the prisoner sought to have one of the Prison Project attorneys disbarred for refusing to pursue the claim. The sound advice of the attorney was that the inmate should turn his light on, sit down, and enjoy his breakfast.

Support for the position that inmates are incapable of preparing meaningful legal papers can be found in Justice Stewart's dissent in *Bounds v. Smith, supra,* in which Chief Justice Burger joined. Justice Stewart found the majority's reasoning as to the existence of a constitutional right of meaningful access to the courts on behalf of state prisoners to be unpersuasive. Assuming such a right existed, however, Justice Stewart was of the opinion that the mere provision of law libraries to inmates would be insufficient to give substance to that right, stating:

> More than 20 years of experience with pro se habeas corpus petitions as a Member of this Court and as a Circuit Judge have convinced me that "meaningful access" to the federal courts can seldom be realistically advanced by the device of making law libraries available to prison inmates untutored in their use. In the vast majority of cases, access to a law library will, I am convinced, simply result in the filing of pleadings heavily larded with irrelevant legalisms—possessing the veneer but lacking the substance of professional competence.

430 U.S. at 836, 97 S.Ct. at 1502. Fortunately, the burden of deciding whether or not the right of meaningful access exists does not lie with this Court. The Supreme Court has said that it does exist and this Court is bound to follow that decision to the best of its ability. With that in mind, the Court is in complete accord with Justice Stewart that law libraries, at least in this state, could never suffice to ensure meaningful access to the courts for Florida's prisoners.

In short, the evidence received in this case throughout the years, as well as the Court's own experiences, have consistently demonstrated that most prisoners are totally unequipped, both in terms of their education and their mental capacity, to effectively prepare and file their own meaningful legal papers. Therefore, even assuming each of Florida's indigent state prisoners had unrestricted access to a complete law library, the mandate of *Bounds v. Smith, supra,* would not be satisfied. The defendant himself has apparently recognized this fact and has attempted to rescue his original law library plan by throwing it a lifeline in the form of the trained inmate law clerk program described *supra.* That lifeline, however, is too tenuous to survive the wake left by *Bounds.*

Much of the testimony at the 1978 evidentiary hearing was aimed at demonstrating the efficaciousness of the inmate law clerks. The defendant succeeded in establishing that the "model" inmate law clerks who testified were sincere, hard-working individuals, interested in helping other inmates and possessing a relatively high degree of intelligence and articulateness. However, the evidence also established the pseudo nature of the inmate law clerk program. In the final analysis, it is a facade; a misguided, albeit well-intentioned, effort that forces all prisoners in need of legal assistance to rely upon a group of ill-trained laymen who attempt to pass themselves off as lawyers. The testimony of the inmate law clerks showed that they suffer from an exaggerated sense of their abilities, while at the same time lacking any recognition of their limitations.

This observation was exemplified by the testimony of Reginald Robertson, a former inmate law clerk of the New York Department of Corrections who had completed the 30-hour legal research course given by West Publishing Co. As noted *supra,* the defendant's plan was modeled after one employed by the state of New York. Robertson's testimony made it clear that he viewed his functions as an inmate law clerk as extending far beyond those of a mere law library assistant. Rather, his approach to handling a "client's" request for assistance mirrored that of an attorney, beginning with an initial consultation interview for each inmate and continuing through final disposition of the problem. He testified that:

> [w]hen we finally did get to him we would investigate his claim to the extent that we were able within the institution to ascertain, if we could, the validity of his claim.

> We would then, after taking down all the facts and marshaling all the facts, we

would research the facts to determine if they [sic] was a viable claim. If there were, we would prepare the papers for the inmate.

1978 Tr. 141. Robertson stated that he would only occasionally refer inmate requests for assistance to an outside attorney, even though the New York Department of Corrections funded an organization that provided professional legal assistance to prisoners: [29]

> On occasion an attorney would think the petition could be a very good one. Okay. And they would request to represent the inmate on that particular list [sic]. And because the attorney was a friend of mine, I would allow him to do that, see?
>
> Q. You would make the decision on whether or not the attorney would get involved or not?
>
> A. Yes.
>
> Q. And not the inmate you were representing?
>
> A. Yes.

1978 Tr. 183.

Robertson testified that, for the most part, he would contact outside attorneys only for the purpose of soliciting "suggestions" or "feedback," and stated that he would make "the final decision" regarding any suggestions the attorney might make. 1978 Tr. 184. This was true even though Robertson's education was limited to a high school equivalency diploma and a 30-hour course in legal research.

Like the New York plan in which Robertson was a participant, the defendant's proposed plan would elevate and ensconce the status of certain writ-writers; in effect, stamping them with an institutional seal of approval. Unlike the New York plan, however, the defendant's program would not provide any alternative avenue of access for inmates who are unable, either because of their illiteracy or some other reason, to prepare their own legal papers. Such inmates would have no choice but to depend upon one of defendant's inmate law clerks.

The defendant's reliance upon a cadre of inmate law clerks fails, for many reasons, to satisfy the state's constitutional duty under *Bounds*. To begin with, the program is afflicted with the same problems of access that plague the law library system in general. Apparently, the inmate law clerks would operate only at those institutions equipped with major law libraries. Defendant's Ex. L. As noted *supra*, those institutions house only 50 percent of the prisoners within the defendant's custody. Presumably, the inmate law clerks would do research upon written request from inmates in outlying institutions, but the efficacy of such a plan is doubtful in light of the small number of inmate law clerks as compared with the total number of prisoners.

The principal deficiency of the inmate law clerk plan, however, is that which was alluded to earlier, that is, it casts, with official sanction, laymen in the role of lawyers. While recognizing that the defendant's inmate law clerks serve a useful purpose, the plain and simple truth of the matter is that they are not qualified to function as lawyers. They are only law library assistants. The mere thought that a 30-hour "How To" course in legal research transforms an otherwise uneducated and untrained prisoner into someone capable of understanding and formulating meaningful legal reasoning is ludicrous.[30]

---

**29.** The state of New York funds an organization called Prisoner Legal Services, Inc., a group of 20 attorneys and seven paralegals, to provide legal assistance to prisoners. Executive Director Daniel J. Steinbock testified that his organization succeeded in obtaining 53,000 days of jail time credit for about 200 of New York's prisoners by gathering the various court documents that provided that previous time served by the prisoners was to be credited. He expressed his opinion that inmate law clerks would not have been able to achieve the same results due to their inability to utilize outside resources. 1978 Tr. 233.

**30.** In fact, within a few years, most of the inmate law clerk positions would be filled by persons who had never even taken the legal research course administered by West Publishing Co. Under the defendant's plan, replacement law clerks would be trained by their predecessors, rather than take the legal research course themselves. 1978 Tr. 285.

At the time of the 1978 hearing, Fred J. Gearing was the most illustrious and capable of the defendant's inmate law clerks. Not only had Gearing completed the West Publishing Co. legal research course, he had attended the Southwest Paralegal Institution at the University of Houston law school prior to his incarceration and had obtained numerous college credits at various universities. 1978 Tr. 353. Copies of pleadings prepared by Gearing introduced at the 1978 hearing showed that he was an unusually literate and articulate inmate. In fact, he assisted in preparing the defendant's "Training Manual For Use in Prison Law Libraries," intended for use in all of Florida's institutions. Defendant's Ex. V.

Nevertheless, despite these credentials, Gearing sought assistance from the Prison Project attorneys in the course of preparing his *own* case, involving an institutional civil rights problem. 1978 Tr. 561–66. This was not unusual, according to the testimony of Richard Belz, director of the Prison Project. Belz testified that many of the "famous" writ-writers confined within Florida's institutions, while they routinely prepared petitions for other inmates, sought assistance from the Prison Project when it came to preparing their own cases. 1978 Tr. 566.

It is certainly noteworthy that writ-writers become cognizant of their limitations only when their own lives are at stake. This Court's experience with veteran writ-writers has typically been that, while their petitions generally look nicer and read better than those prepared by most inmates, their legal reasoning remains convoluted and even nonsensical. The conclusions they draw from stated facts are often non sequiturs. The fact that their petitions are usually typed and their legal citations approach a recognizable form does not alter the foundational defect inhering in most of the petitions—the content!

In addition to the inability of inmate law clerks to think like lawyers, they face other obstacles in attempting to function as such. They are, one must remember, prisoners.

Consequently, they are unable to utilize outside resources to any meaningful degree. They cannot, e.g., investigate cases, interview witnesses, appear in court, or even make long distance telephone calls.

Moreover, the inmate law clerks have achieved their elevated status through the grace of the powers that be, i.e., the officials of their respective institutions. The position of inmate law clerk is a highly desirable one,[31] one that an inmate would understandably be reluctant to jeopardize. As such, legal assistance could be effectively curtailed in one of the areas in which it is most needed—institutional civil rights problems.

Harry H. Walsh was Director of the Texas Department of Corrections Inmate Legal Assistance Program when he testified at the 1973 evidentiary hearing. Walsh testified that his organization, which consisted of nine attorneys, was prohibited by the Texas Department of Corrections from representing inmates in civil rights actions against departmental officials. He expressed his opinion that the prohibition was proper due to the inherent conflict of interest arising from the fact that his organization was voluntarily funded by the Texas Department of Corrections, testifying that:

[a]s employees, we do not believe that we can honestly represent inmates who wish to sue prison officials, to prosecute that litigation if we are working with, eating with, and in some cases living on the units with other prison officials, and I think the personal conflicts there are pretty obvious.

1973 Tr. 106.

If attorneys feel they are unable to properly handle inmate civil rights complaints against state department of corrections officials because their organization is funded by the department, it would appear that an institutional inmate law clerk, whose entire life is controlled by those officials, would be in an even more tenuous position. Testimo-

---

**31.** Gearing's testimony served to underscore the attractiveness of the inmate law clerk position. He testified that he waived his 1978 parole date and agreed to remain in prison for two additional years to enable him to continue functioning as an inmate law clerk! 1978 Tr. 355.

ny at the 1978 evidentiary hearing tended to bear this contention out. Gearing, the state's model inmate law clerk, testified that he had never filed a civil rights action on behalf of an inmate. 1978 Tr. 392. This is somewhat unusual inasmuch as Gearing was an inmate of Union Correctional Institution (U.C.I.), the state's largest penal institution with 2,272 inmates. U.C.I. is located in this Court's district, i.e., the Middle District of Florida. Recent figures show that more federal civil rights actions (949) were filed by state prisoners in the Middle District of Florida last year than in any other federal district except one. Administrative Office of the United States Courts, Annual Report of the Director 64 (1981). Although precise figures are not available, a substantial number of those actions were filed by inmates of U.C.I. Consequently, Gearing's failure to file any civil rights actions on behalf of U.C.I. inmates lends support, at least inferentially, to the Court's concerns regarding possible conflict of interest problems in the defendant's inmate law clerk program.

In the final analysis, the problems described above combine to render the inmate law clerk plan wholly inadequate, under the facts of this case, to boost the proposed law library system above the level necessary to satisfy the constitutional mandate of *Bounds v. Smith, supra,* that the state of Florida take affirmative steps to ensure that all prisoners have meaningful access to the courts for the purpose of attacking the legality of their convictions and the conditions of their confinement. The question that then remains is what *is* necessary to satisfy that mandate. In this Court's opinion, meaningful access to the courts on behalf of all of Florida's inmates can be realized only through a plan that incorporates the assistance of counsel, in some form.

The defendant, of course, disagrees, pointing out that in *Bounds,* the Supreme Court expressly held that:

the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or* adequate assistance from persons trained in the law.

430 U.S. at 828, 97 S.Ct. at 1498 (emphasis added). Since the holding was framed in the disjunctive, i.e., adequate law libraries *or* adequate assistance from persons trained in the law, defendant contends that his proposed library plan fulfills the requirements of *Bounds.*

The defendant's interpretation of *Bounds,* however, is far too simplistic and mechanical. While it is true that the *Bounds* opinion indicated that "adequate law libraries are one constitutionally acceptable method to assure meaningful access to the courts," [32] the Court made it clear that meaningful access is the pivotal concern. If a law library plan fails to ensure meaningful access for all inmates, it cannot be said to be "adequate." This position was adopted by the United States Court of Appeals for the Fifth Circuit in *Cruz v. Hauck, supra,* wherein the court stated:

The central question in evaluating whether a law library adequately provides meaningful access to the courts is whether the facility will enable the prisoners to fairly present their complaints to a district court. It is not enough simply to say the books are there, when the plaintiffs contend that they do not have the assistance necessary to use the books properly. All of the circumstances must be evaluated in determining the adequacy of a library, and the district court erred by holding that a prison library without any assistance in its use sufficed to provide access to the courts for all the prisoners detained.

\*   \*   \*   \*   \*   \*

Although *Bounds* says that either an adequate law library *or* assistance from persons trained in the law may satisfy the fundamental constitutional right to access to the courts, the fundamental concern is still whether the inmates have *meaningful* access to the courts. Library books, even if "adequate" in number, cannot provide access for those persons who

---

**32.** 430 U.S. at 830, 97 S.Ct. at 1499.

**1350**

do not speak English or who are illiterate. Library-use assistance might solve the problem presented.

627 F.2d at 720–21. In *Cruz*, the court of appeals suggested that perhaps paralegals or writ-writers, if adequate in number, could be employed to assist inmates in using the jail law library that formed the focus of the case,[33] thereby possibly satisfying the requirements of *Bounds*. However, with regard to the plaintiffs' final contention that the district court had erred in finding that inmates at the facility were provided with the assistance of counsel, the court observed:

> [t]he lower court's findings of fact are again deficient in that it appears that inmates are not afforded counsel in conjunction with the *initiation* of these two types of actions [habeas corpus and civil rights]. *Unless the library adequately provides access to the courts for all inmates, some other assistance should be available for the initiation of habeas corpus and civil rights actions.*

627 F.2d at 721 (emphasis partially added). Presumably, "some other assistance" refers to the assistance of counsel.

Accordingly, although the specific question has never been addressed, the position that lawyers are an essential ingredient of Florida's attempt to provide inmates with meaningful access to the courts finds support in *Bounds*, as well as in the law of this circuit, i.e., in *Cruz*.[34] While the Supreme Court indicated that law libraries may be one means of protecting the right of prisoners to access to the courts, it emphasized that "[m]eaningful access . . . is the touchstone." 430 U.S. at 823, 97 S.Ct. at 1495. Similarly, the panel in *Cruz*, recognizing that meaningful access was the "central

tenet" of *Bounds*,[35] stated that the primary question in evaluating whether a law library provides meaningful access to the courts is whether the facility will enable all prisoners to fairly present their claims to a district court. 627 F.2d at 720.

Therefore, regardless of what type of plan is proposed—whether it calls for law libraries, writ-writers, paralegals, law students, lawyers, or a combination of all of these—it would fail to pass constitutional muster unless it provided meaningful access to all prisoners. In other words, although the components of the legal equation are variable, subject to change depending upon the facts of the particular case, the essential result—meaningful access to the courts—remains the same. While a plan similar to the one proposed by defendant could possibly function adequately in some other state, it could not in Florida. The evidence in this case has shown that the defendant's proposed law libraries and inmate law clerks would not enable all, or even a majority, of Florida's 21,575 prisoners to fairly present their claims to a district court.

Why are lawyers necessary? The answer has already been given. For the many, many prisoners who, under the defendant's plan, would be denied physical access to a well-equipped law library or who would be unable to effectively use a law library even assuming they were granted unlimited access, the assistance of counsel would be the only means through which they could enjoy meaningful access to the courts. A lawyer would be able to directly contact an inmate, listen to his claim, draw out the essential facts, disregard the extraneous facts, analyze the problem in light of existing law,

---

**33.** *Cruz* was a class action commenced in 1970 by inmates of the Bexar County Jail, San Antonio, Texas, a facility housing from 400 to 600 inmates.

**34.** Pursuant to the Fifth Circuit Court of Appeals Reorganization Act of 1980, P.L. 96–452, 94 Stat. 1995, this Court, i.e., the United States District Court for the Middle District of Florida, parted from the former Fifth Circuit and became part of the Eleventh Circuit. However, decisions of the former Fifth Circuit remain

binding as precedent in the new Eleventh Circuit unless and until conflicting case law is established by the Eleventh Circuit Court of Appeals. *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206, 1207 (11th Cir. 1981). Consequently, inasmuch as no decision contrary to *Cruz v. Hauck, supra*, has been entered by the Eleventh Circuit Court of Appeals, the *Cruz* opinion remains binding upon this Court.

**35.** 627 F.2d at 721 n. 21.

and then decide whether the claim should be pursued, either because it is meritorious under existing law or because recent legal trends make it reasonably likely that favorable new law could be established or unfavorable precedent overturned.[36] In short, lawyers not only understand the law, but also possess the training and experience to use it effectively.

In addition to the obvious analytical and other cognitive advantages that lawyers enjoy over prisoners, there are other practical benefits to a plan that provides for the assistance of counsel. Lawyers are able to employ outside resources to a much greater degree than prisoners, e.g., they can travel to interview witnesses, examine documents and other evidence and, of course, lawyers are able to appear in court. Moreover, lawyers would be able to function free from the conflict of interest problems that confront institutional law clerks.

With regard to civil rights complaints, because a lawyer generally possesses more leverage and credibility than a prisoner, it is likely that many institutional civil rights disputes could be resolved at an early stage, without the necessity for judicial intervention, simply through discussions between the attorney and the appropriate prison official. In fact, Richard Belz testified that he has often resolved civil rights complaints in this manner, thereby obviating the need to levy more prisoner civil rights petitions upon the federal judicial system. 1978 Tr. 501.

The recent flood of prisoner petitions is a dilemma that is plaguing the federal courts. During the twelve-month period ending June 30, 1981, prisoners filed 27,711 actions in the federal district courts, comprising 15.3 percent of all civil cases filed. This constituted a 1,172.9 percent increase over the number of prisoner petitions filed in 1960 and a 73.2 percent increase over those filed in 1970. The 6,667 prisoner petitions filed in 1981 in the former Fifth Circuit, of which Florida was a part, far exceeded the number filed in every other circuit, in most cases by three to four thousand. As noted *supra*, the number of prisoner petitions filed within this Court's district in 1981 exceeded the number filed in every other federal district except one (the Eastern District of Virginia). Administrative Office of the United States Courts, Annual Report of the Director 61–65 (1981).

This onslaught of prisoner petitions constitutes yet another factor militating in favor of a plan that provides for the assistance of attorneys. While not directly pertinent to the constitutional aspects of the issue raised herein, the effect of adopting such a plan upon the workload of the federal courts, as well as upon the workload of the Florida Attorney General's Office, is a major concern that should be shared by all. Although it is impossible to state with certainty, one would anticipate that providing inmates with the assistance of counsel would operate to reduce the tremendous number of prisoner petitions presently being filed.

Many non-frivolous civil rights claims would be resolved administratively, as already indicated, through discussions between counsel and prison officials. Moreover, since a prisoner would be able to contact an attorney prior to taking any action on his own, the number of frivolous petitions would decline as well because, presumably, an inmate would heed the advice of an attorney who told him that there was no merit to his claim. Of course, there would always be some querulous inmates

---

**36.** Just three weeks prior to the 1978 evidentiary hearing the Supreme Court entered its opinion in *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), the companion case to *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), wherein the Court held that the double jeopardy clause prohibits retrial of a defendant whose conviction was reversed solely due to the insufficiency of the evidence. The Prison Project had represented petitioner Greene throughout the proceedings challenging the legality of his conviction, losing at every stage until ultimately winning in the Supreme Court. The decisions in *Burks* and *Greene* constituted a reversal of existing precedent and a major change in the area of criminal law. At the 1978 hearing, Richard Belz, Director of the Prison Project, expressed his opinion that a prisoner would not have been able to pursue Greene's case to the same successful conclusion. 1978 Tr. 525. The Court is inclined to agree.

who, once they perceive that an injustice has been committed against them, would file a complaint even though told by an attorney that the complaint is frivolous. Hopefully, such inmates would represent only a small minority. In addition to reducing the number of non-meritorious petitions filed, attorney assistance would substantially upgrade the quality of the petitions that are filed. This would diminish the amount of time typically required to peruse and construe pro se petitions.

Thus, providing inmates with the assistance of counsel would result in reduced costs not only for the federal judicial system, but also for the state of Florida. It would be interesting to calculate the number of hours spent each year by assistant attorney generals in responding to frivolous and/or unintelligible prisoner petitions. Unfortunately, the Court is all too aware of the inordinate amount of time it is forced to devote to deciphering and disposing of such petitions.

Finally, while providing convicted prisoners with trained counsel to assist them in *Bounds*-type legal proceedings may appear at first blush to be somewhat of a radical concept, it is significant that when *Bounds* was decided five years ago nearly half the states were already providing professional or quasi-professional legal assistance to prisoners. *Bounds v. Smith, supra,* 430 U.S. at 830–31, 97 S.Ct. at 1499. Moreover, it is certainly noteworthy that all four amicus parties in this cause, which include the Florida Bar and the United States Department of Justice (hardly radical organizations), have recommended the adoption of a plan providing for the assistance of counsel.

## PARAMETERS OF COURT'S DECISION

The decision entered today is limited to a disapproval of the defendant's proposed plan and a holding that an adequate plan for providing Florida's indigent state prisoners with meaningful access to the courts must incorporate the assistance of attorneys. The Court will not attempt to formulate the precise details of the plan. That task will be left to the parties who will be ordered to resubmit proposed plans in accordance with this opinion. Some general observations, however, can be made:

1. Any acceptable plan must ensure meaningful access to the courts on behalf of *all* persons who are presently or who will hereafter be committed to the custody of the Florida Department of Corrections.

2. Attorney-assistance can be constitutionally limited, under *Bounds*, to the preparation and filing of actions challenging the legality of a prisoner's confinement (Fla.R.Crim.P. 3.850 proceedings and state and federal habeas corpus proceedings) and the legality of the conditions of a prisoner's confinement (federal civil rights proceedings).

3. The attorney-assistance program should be structured so that the attorneys, although funded by the state of Florida, would be able to function independently, free from the conflict of interest problems testified to with regard to the program operated by the Texas Department of Corrections.

4. Defendant should give serious consideration to a plan similar to that proposed by plaintiff-intervenors, whereby 20 attorneys,[37] assisted by seven paralegals and seven secretaries, would operate three or four branch offices dispersed across the state. In effect, such a plan would amount to an expanded version of the Prison Project, an organization that has repeatedly proven its worth throughout the course of this litigation.

5. The plan should provide for the continuation of defendant's law library and inmate law clerk program in order to enable prisoners to represent themselves should they desire to do so. This would operate to reduce the demands upon the attorney-assistance program inasmuch as many prisoners would undoubtedly seek advice only to assist them in preparing petitions on their own.

---

**37.** The plan was proposed in 1978. It is possible that a larger staff would be needed today due to the increase in Florida's prison population.

Prior to ordering submission of proposed plans, however, the Court will grant defendant an opportunity to appeal from this dispositive, albeit not "final," decision. Since, as part of the decision, the Court will order that the preliminary injunction (prohibiting defendant from permitting termination of the Prison Project) continue in effect, the decision is appealable as of right under 28 U.S.C. § 1292(a)(1).[38] However, in order to ensure complete appellate review of the critical question decided herein, the Court will certify the decision as an appealable order pursuant to 28 U.S.C. § 1292(b).[39] Clearly, the instant decision meets the criteria set forth in that statute. The opinion and order entered this date resolve the controlling constitutional question remaining in this cause, a question that has served as a roadblock to effective settlement negotiations for several years. Moreover, there is a substantial ground for difference of opinion as to how the question should be resolved. Final resolution of the question by the United States Court of Appeals for the Eleventh Circuit and, perhaps, the Supreme Court, would materially advance the ultimate termination of this already protracted litigation.

Should the decision be affirmed, the defendant would in all likelihood cooperate in establishing an attorney-assistance program mutually acceptable to all concerned, thereby saving considerable amounts of time and money that would otherwise be expended on further adversary litigation aimed at hammering out a suitable plan. On the other hand, if the Court decided to proceed on the premise that attorney-assistance is required and the instant decision is subsequently reversed, all the time, effort and funds expended on developing and implementing an attorney-assistance plan would be wasted. In short, this litigation and the issue decided today present a classic example of the exceptional or "big" case to which it is often said that 28 U.S.C. § 1292(b) was intended to apply. *See Kraus v. Board of County Road Commissioners*, 364 F.2d 919, 922, (6th Cir. 1966); *United States Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966); *In re Heddendorf*, 263 F.2d 887, 888 (1st Cir. 1959). *But see Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 702–03 (5th Cir. 1961) (wherein Judge Brown indicated that 28 U.S.C. § 1292(b) was designed to instill flexibility in the appellate machinery and was not intended to be employed only in the "big" or "expensive" case).

This Court has, over the years, frequently been maligned for being "soft" on prisoners. Many people are simply unwilling to accept the fact that all persons in this country have certain basic rights, even prisoners. It would probably be enlightening for those people to read some of the correspondence this Court receives from prisoners on a daily basis. One would think that excerpts from letters like the following would be sufficient to evoke compassion in even the staunchest defenders of law and order:

I need help. Hope you understand cause these people don't. I was an inmate of U.C.I. back in 1980. I am Eliptic. And Hemophilia. I was place in the West Unit of U.C.I. where on 12–20–1980 I was accosted by another inmate. Who threaten my life and threaten my manhood by attempting to comitt forcible rape on me.

I was transfer to [unintelligible] where I was once again violently assaulted and

---

**38.** Title 28 U.S.C. § 1292(a)(1) provides in pertinent part:

(a) The courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts ... granting, *continuing*, modifying, refusing or dissolving injunctions ....

(Emphasis added).

**39.** Title 28 U.S.C. § 1292(b) provides:

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within 10 days after the entry of the order. *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

rape. I was subsequently beaten and raped by inmate's.

Lt. [name omitted] had me place in open holding cell where I was once again viciously assaulted. My lip was tore and I was beaten and bruised over my whole body. I was tooken to M.T. I was treated by placeing 36 striche's in my [unintelligible] lip area.

On Aug. 28th my friend [name omitted] got stabb 27 time's. He subsequently die. I was transfer to M.C.I. [Marion Correctional Institution].

\*    \*    \*    \*    \*    \*

I am a register Epileptic and know Hemophilic. I have ask for Phychiatric Treatment. Please let explain. 1. I been rape. 2. I watch my best friend get stabb 27 time. He die right front my face. 3. I use to be on hard drugs till I come to prison. 4. My parent abuse me. Like takeing your hands put them on stove. Take a belt beat you till the blood run out.

\*    \*    \*    \*    \*    \*

I afraid to go to sleep. I stay awake. I can see me being rape or me takin that neelle putting it in my arm or my father putting my hand on the stove it's driving me crazy.

Please I need help. I use to be at the state hospital I sure [unintelligible] stay. Please Judge Scott can you set an pointment with you like me talk to you. The Dr. toll me she couldn't sent me state hospital for help.

\*    \*    \*    \*    \*    \*

Please I need help. I don't have but a mouth to go. I need to be somewhere I can get help. I will stay as long as you see fit. For me to stay.

This obviously disturbed inmate has basic rights that are being violated, most notably the right to psychiatric treatment and the right to be free from violent physical assault. Would anyone argue that he is not entitled to those rights simply because he is a prisoner? After all, persons are sent to prison *as* punishment, not to *be* punished. Only one avenue of redress exists for the inmate—through the courts in the form of a federal civil rights action; yet would anyone seriously argue that he is capable of functioning as his own lawyer?

Without some protection of the fundamental right of meaningful access to the courts, a prisoner's other rights mean nothing. It is an oft-quoted maxim of law that a right without a remedy is no right at all. In this case, there are rights and there are remedies, but until Florida begins providing its prisoners with the assistance of counsel, never the twain shall meet.

Eleven years of intense litigation has passed and yet most of Florida's inmates enjoy no greater right of meaningful access to the courts than they did when the Court received Harold Raymond Hooks' first handwritten petition in November 1970. The Court still receives several letters each month from inmates requesting legal advice and/or legal counsel which, of course, this Court is not in a position to give. The following correspondence, recently received, is typical:

Dear Judge Scott,

I am writing in hope's that you will assist me in a very serious problem.

I am presently incarcerated as a result of my past.

I am ignorant to law and wish legal counsel.

I have been convicted of a crime that I did not do, and it is my intention's to prove my innocent, but without an attorney to help me I can not effectively deal with this problem.

I am one of the typical individual's of a minority who likes education and funds to deal with this problem; In addition, My Public Defender has withdrawn for my case leaving me helpless; also the institution I'm in doesn't have an adequately equip Library to research in.

I am not good at communicating threw Letter's to appeal my case nor stress [express?] myself, so I ask a friend to write this letter.

Enclose is a letter that my attorney [public defender] sent me, I hope it will be of some help.

Any assistance you have to offer will be very much appreciated.

 

Thank you.

Cordially,

Otis J. Wilson

Otis J. Wilson. Just one prisoner among thousands. The Court will never know whether or not Otis Wilson had a valid habeas corpus claim. Indeed, it is unlikely that even Otis Wilson will ever know.

An order will be entered in accordance with this opinion.

## ORDER

In accordance with the opinion entered this date, it is

ORDERED:

1. The defendant's proposed plan for ensuring meaningful access to the courts on behalf of prisoners in the custody of the Florida Department of Corrections is, for the reasons set forth in the opinion accompanying this order, hereby disapproved.

2. Any acceptable plan for ensuring meaningful access to the courts on behalf of the prisoners in the custody of the Florida Department of Corrections must, for the reasons set forth in the opinion accompanying this order, provide for the assistance of counsel.

3. The preliminary injunction entered October 6, 1977, as clarified by order of October 28, 1977, shall continue in full force and effect until an acceptable plan has been approved by the Court.

4. Pursuant to 28 U.S.C. § 1292(b), the Court hereby certifies this order and accompanying opinion as appealable, specifically finding that: (a) this order and opinion resolve a controlling question of law as to which there is substantial ground for difference of opinion; and (b) an immediate appeal from this order and opinion will materially advance the ultimate termination of this litigation. Defendant is advised that, under 28 U.S.C. § 1292(b), he must make application to the Court of Appeals within ten (10) days of the entry of this order.

5. Except as provided in paragraph 3 of this order, all proceedings in this cause are hereby stayed pending opportunity for defendant to appeal from this order and accompanying opinion.

6. Sid J. White is hereby dismissed as a party defendant to this cause.